UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

LAURIE REDMANN,                                         Civil No. 04-1669 (JRT/FLN)

          Plaintiff,

v.

JO ANNE B. BARNHART,                          **REPORT AND RECOMMENDATION**
Commissioner of Social Security,

          Defendant.

_____

Randall J. Fuller, Esq., for Plaintiff .
Lonnie F. Bryan, Assistant United States Attorney, for the Government.

_____

Plaintiff Laurie Redmann seeks judicial review of the final decision of the Commissioner of

Social Security ("Commissioner"), denying her application for  disability insurance benefits

("DIB").  The matter has been referred to the undersigned United States Magistrate Judge pursuant

to 28 U.S.C. § 636 and Local Rule 72.1(c).  This Court has jurisdiction over the claim pursuant to

42 U.S.C. §§ 405(g) and 1383(c)(3).  The parties have submitted cross-motions for summary

judgment [#8 and #10].  For the reasons set forth below, it is this Court's recommendation that the

Commissioner's decision be reversed and the case remanded for further administrative proceedings

consistent with this Report and Recommendation.

## I. INTRODUCTION

Plaintiff Laurie Redmann ("Plaintiff") applied for DIB on July 11, 2002, claiming she had

been disabled since October 19, 2001.  (Tr. 52-54).  Plaintiff's alleged impairments include

trigeminal neuralgia, severe facial pain after microvascular decompression surgery and gamma knife

radiation for trigeminal neuralgia, pain disorder, obesity, depression, anxiety, asthma, blurred vision

and carpal tunnel syndrome. (Tr. 15-16, 70). The Social Security Administration denied her application initially and upon reconsideration. (Tr. 26-38). Plaintiff timely filed a request for a hearing which was held before Administrative Law Judge (ALJ) Michael D. Quayle on July 31, 2003. (Tr. 39, 47, 308-331). At the hearing, Ms. Redmann was represented by counsel and testified. (Tr. 308-311). Julie Harren, a neutral vocational expert, also testified. (Id.). On October 27, 2003, ALJ Quayle rendered an unfavorable decision finding Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 14-25). The Appeals Council of the Social Security Administration denied Plaintiff's request for review on March 3, 2004, leaving the ALJ's decision the final decision of the Commissioner. (Tr. 7-9).

On April 19, 2004, Ms. Redmann commenced this civil action in federal court seeking review of the Commissioner's decision [#1]. The Commissioner Answered on June 29, 2004, and now both parties have submitted cross-motions for Summary Judgment [#4, #8, #10].

## II.  STATEMENT OF FACTS

### A.     Background

Plaintiff was born on May 8, 1965, and was 38 years-old at the time of the hearing before the ALJ. (Tr. 311). Plaintiff has a high school education and completed two years of college. (Id.). Plaintiff has had multiple work experiences, including an overnight stocker at Walmart, a police dispatcher, a 911 operator, a AAA towing dispatcher, a security guard, and various customer service, clerical, and sales positions. (Tr. 71, 77, 83-110). Plaintiff has not worked since October 19, 2001, the alleged onset date of her disability. (Tr. 313).

### B.     Medical Evidence

Plaintiff has had a history of migraine headaches. (Tr. 253). In October 2001, Plaintiff

suffered a migraine that lasted longer than usual.  (Tr. 253).  On October 25, 2001, Plaintiff saw Dr.

Berliner of the Allina Medical Clinic who initially concluded the headache was caused by muscle

tension.  (Tr. 186).  On October 29, 2001, Plaintiff went to the emergency room asserting that her

migraine pain had become sharper and caused blurred vision.  (Tr. 159).  A CT scan at that time

showed no abnormalities (Id.).   On October 31, 2001, Plaintiff again saw Dr. Berliner and

complained of short bursts of intense pain which would last only for a few seconds but keep

recurring.  (Tr. 184).  Dr. Berliner provided an initial diagnosis of trigeminal neuralgia and

prescribed more medication directing Plaintiff to follow up as needed.  (Id.).  On November 13,

2001, Plaintiff returned to Dr. Berliner stating that the shooting pain in her left side continued and

the medications only provided temporary relief. (Tr. 183).  Plaintiff explained that the pain

prevented her from driving and functioning normally or working.  (Id.).  Dr. Berliner ordered an

MRI and a follow-up consultation with a neurologist.  (Id.).

In the MRI, Plaintiff's central nervous system and skull base structures appeared normal.

(Tr. 188).  The MRI also showed two areas of signal alteration in both hemispheres which were

described as non-active lesions, but might reflect multiple sclerosis.  (Id.).  On November 19, 2001,

Plaintiff saw Dr. Sethna of the Noran Neurological Clinic.  (Tr. 253-55).  Dr. Sethna opined that it

was possible that the areas of signal alteration may have resulted from a head injury in the past, but

could also be symptomatic of multiple sclerosis.  (Tr. 254).  Dr. Sethna also described Plaintiff's

jabbing facial pain as trigeminal neuralgia and prescribed Neurontin for the pain. (Tr. 154).  He also

recommended a spinal tap examination for multiple sclerosis. (Tr. 154).  The spinal tap examination

was normal and negative for multiple sclerosis.  (Tr. 251, 265, 267).  On November 30, 2001,

Plaintiff reported to Dr. Sethna that the continuous pain in her face was gone but she continued to

get "lightning bolts of pain in her face, chin, into the bid face, behind the eye, or into the forehead every five to fifteen minutes." (Tr. 251). Dr. Sethna noted that Plaintiff was unable to drive because of the symptoms and he documented with her insurance company that due to her problems, she was unable to work at the time. (Tr. 251). Plaintiff's pattern shift visual evoked response study to again test for multiple sclerosis returned normal. (Tr. 248). During a December 7, 2001, visit with Dr. Sethna, Plaintiff stated that her facial pain had not improved and she was having longer and more severe episodes of pain. (Tr. 248). On December 14, 2001, Dr. Sethna noted that Plaintiff's facial pain symptoms had not improved and she was overtly hypersensitive to stimulation in the V2 distribution on the left side of her face which continued to look more and more like trigeminal neuralgia. (Tr. 246). Dr. Sethna continued to opine that Plaintiff was unable to work. (Id.).

Plaintiff saw Dr. Robert Jacoby for a second opinion on January 23, 2002. (Tr. 238-41). Dr. Jacoby concurred with Plaintiff's diagnosis of trigeminal neuralgia which was nonresponsive to normal medications used to treat such a diagnosis. (Tr. 240). Plaintiff Redmann was referred to Dr. Bruce Pollack, a neurosurgeon at the Mayo Clinic on February 13, 2002. (Tr. 221). Dr. Pollack recommended microvascular decompression surgery on the left trigeminal nerve to release any pressure on the nerve. (Tr. 213, 214, 221). The surgery was performed on February 18, 2002, and revealed that the superior cerebellar artery appeared to compress the arachnoid membrane surrounding the nerve, and the area around the nerve was thickened and opaque. (Tr. 212, 230).

Initially, Plaintiff Redmann reported some numbness in her lower facial area but that the facial pain had ceased. (Tr. 212, 230). After two follow-up examinations, Plaintiff's facial pain had not reappeared but Dr. Pollack extended her release from work because she continued to experience unsteadiness, generalized headaches, and localized incisional pain. (Tr. 207, 208-10). During a

4

May 8, 2002, examination, Dr. Pollack reported that Plaintiff Redmann continued to have a series of problems. (Tr. 206). Plaintiff continued to have incisional pain and constant pain in her tongue and chin area. (Id.). Plaintiff reported a recurrence of the facial tic pain and continued unsteadiness and dizziness. (Id.) By a June 10, 2002 visit with Dr. Pollack, Plaintiff stated that her facial pain had returned and become more obvious as the numbness resolved. (Tr. 196). Dr. Pollack recommended non-invasive stereotactic radiosurgery which had a 50-60 percent success rate. (Id.). On July 19, 2002, Plaintiff underwent gamma knife surgery at the Mayo Clinic, in which a pulse of gamma radiation was directed at the left trigeminal nerve. (Tr. 226).

On September 18, 2002, Plaintiff returned to Dr. Berliner complaining of sinus congestion and depression, including mood swings, crying, and melancholy feelings. (Tr. 181). Dr. Berliner discussed mood disorders and depression with plaintiff and gave her a sample months prescription to Fluoxetine. (Id.). He noted that Plaintiff had been treated for depression in the past. (Id.).

Plaintiff again saw Dr. Sethna on October 16, 2002. Plaintiff complained that she had not had any relief from the gamma knife radiation and the pain had actually escalated to "unrelenting horrible pain" on both sides of her face. (Tr. 230). Plaintiff explained that cold or chewing could precipitate the pain but she was never awakened by the pain at night. (Id.). Upon examination Dr. Sethna stated that Plaintiff looked comfortable. (Tr. 231). When he placed a cold tuning fork on Plaintiff's face she stated it precipitated an episode of pain. (Id.). However, Dr. Sethna noted that Plaintiff "looked far more composed than any patient I've ever seen with an attack of trigeminal neuralgia." (Id.). Because of atypical features to Plaintiff's symptoms, Dr. Sethna again raised the possibility that she might have multiple sclerosis and ordered a second brain scan. (Id.). Dr. Sethna also recommended neuropsychological testing because the fact that Plaintiff did not suffer from pain

at night suggested the possibility of functional disorder.  (Id.).  On October 18, 2002, Dr. Sethna

wrote a short letter stating that Plaintiff was precluded from productive employment at the time due

to her description of the pain.  (Tr. 229).

On September 19, 2002, a Residual Functional Capacity Assessment Physical was completed

by DDS physician Aaron Mark, M.D.  (Tr. 170-180).  Dr. Mark listed Plaintiff could occasionally

lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds.  (Tr. 171).  Plaintiff could

stand and/or walk about 6 hours in an 8-hour workday and sit about the same amount of time.  (Id.).

Dr. Mark opined that Plaintiff was not further limited in her ability to push and/or pull.  (Id.).

Although Plaintiff sustained postural limitations, she did not show manipulative, visual or

communicative limitations.  (Tr. 172-174).  Plaintiff was also not subject to environmental

limitations except for she was to avoid even moderate exposure to hazards such as machinery and

heights.  (Tr. 174).  Dr. Mark judged that Plaintiff's symptoms were attributable to a medically

determinable impairment, and their severity was consistent with the total medical and non-medical

evidence, including statements by the Plaintiff and others, observations regarding activities of daily

living, and alterations of usual behavior or habits.  (Tr. 175).  Finally, Dr. Mark opined that

Plaintiff's impairments were severe, but not expected to last 12 consecutive months and at that time

she would be able to do light work based on the level of pain she may continue to have.  (Tr. 178,

180).

On December 3, 2002, another Residual Functional Capacity Assessment was completed by

DDS physician William Paule, M.D.  (Tr. 269-79).  Dr. Paule provided a light RFC, including

avoidance of cold breezes which might trigger Plaintiff's pain.  (Tr. 277).  He noted Plaintiff's visit

to the neurologist, Dr. Sethna, in October and his finding that Plaintiff's "pain did not seem as severe

as would be expected with trigeminal neuralgia of the usual kind, and he recommended that she have an MRI, looking for possible multiple sclerosis as a cause." (Id.).  Dr. Paule also noted that there was no report in the record of that MRI or the results of that recommendation. (Id.).  Dr. Paule listed the same exertional limitations as Dr. Mark, but found that Plaintiff had no postural limitations, manipulative limitations, visual limitations, or communicative limitations. (Tr. 270-71).  He also found that Plaintiff had no environmental limitations other than avoiding even moderate exposure to extreme cold and cold breezes. (Tr. 273).

On December 5, 2002, Plaintiff visited Dr. Berliner requesting him to fill out a Residual Functional Capacity form in support of her application for disability. (Tr. 294, 280-285).  Dr. Berliner noted that while Plaintiff's symptoms of facial pain would not interfere with here ability to perform activities of daily living, they were severe enough to interfere with her attention and concentration up to 75% of the day, making her unable to maintain the persistence and pace to engage in either full- or part-time competitive work. (Tr. 281-282).  Dr. Berliner stated that multiple factors could cause an exacerbation of the patients's symptoms: physical activity; movement/overuse; temperature extremes; and work stress. (Tr. 282).  If Plaintiff was employed, fatigue would severely impair her ability to do work and she may need to lie down periodically through the day. (Id.).  Dr. Berliner estimated that Plaintiff's symptoms would cause her to miss work at least four or more times per month and within an eight-hour work day, she would need additional breaks and rest periods, and need to change positions regularly. (Id.).  Dr. Berliner opined that Plaintiff would have to adopt her activities in an unpredictable fashion to accommodate her episodes of neuralgia. (Tr. 283).  Plaintiff could lift 10-20 pounds occasionally, and could only lift less than 10 pounds frequently. (Id.).  Plaintiff could sit indefinitely, stand for 15 minutes at a time,

and walk four city blocks without rest or severe pain.  (Id.).  In an eight-hour day, Plaintiff could sit

for about six hours and stand for less than two.  (Tr. 285).  Plaintiff had good use of her hands and

fingers for repetitive employment tasks involving her hands, arms, and upper extremities.  (Tr. 284).

Plaintiff could frequently reach, pull, push and engage in fine firm grasping, and occasionally

engage in twisting, kneeling, crouching, static neck flexion, and walking up incline.  (Id.).  However,

she could never bend, stoop, climb, crawl, do overhead work, or engage in frequent neck rotation.

(Id.).   On January 15, 2003, Dr. Pollock referred Plaintiff to Dr. E. Lyle Gross, a specialist in

physical medicine and rehabilitation at the Mayo Clinic, for an impairment disability assessment.

(Tr. 287-289).  At this time Plaintiff reported that she was having pain every 10 minutes, that she

sleeps more than normal because her pain leaves her fatigued, and she experiences dizziness and loss

of balance.  (Tr. 288).  Plaintiff's physical examination revealed a normal gait with no nerve

impingement on range of motion.  (Tr. 289).  Dr. Gross opined that Plaintiff should not work in high

stress areas and in roles of management decision-making processes.  (Id.).  She should avoid

working in temperature changing environments and purely stationary positions, including driving.

(Id.).  Dr. Gross also recommended a psychological assessment to determine the impact of Plaintiff's

pain and whether or not further treatment was possible or if further restrictions on her employability

should be made.  (Id.).

Plaintiff was seen by Dr. Daniel E. Rohe of the Mayo Clinic for her recommended

psychological and career assessment on February 12, 2003.  (Tr. 290-91).  The numerous aptitude,

interest, and personality tests revealed that Plaintiff had strong aptitudes in the areas of clerical

perception, spacial aptitude, numerical aptitude, and finder dexterity, while she had a relative

weakness in the area of motor coordination.   (Tr. 290).   The tests indicated that Plaintiff's

8

personality type preferred to work alone with ideas, data or things, and preferred practical learning environments. (Id.). The tests showed Plaintiff was uncomfortable taking charge of others and preferred subordinate roles rather than leadership positions. (Id.). Results showed Plaintiff preferred working in a well established chain of command with clear goals, and saw herself as conscientious, practical, conservative, systematic, accurate, careful and mindful of money and material possessions. (Id.). Plaintiff's interests scored the highest in areas of computer activities, office services, art, applied arts, and culinary arts. (Tr. 191). Vocationally, Plaintiff consistently scored highest in secretarial-type occupations. (Id.). Plaintiff's personality tests indicated that Plaintiff may be prone to experience moderately high levels of negative mood, dissatisfaction, low self-esteem, anxiety, irritability, and skepticism, and that an evaluation for a natural mood disorder was warranted. (Id.). The May 2, 2003, report by Dr. Gross stated that the psychological vocational assessment done on Plaintiff indicated that she did have some significant weak areas and further rehabilitation was necessary for her to be employable. (Tr. 287). Dr. Gross opined that she was "totally disabled based on these findings." (Id.). On May 6, 2003, a letter from Dr. Gross was issued listing her final diagnoses as trigeminal neuralgia, vocational limitations, and migraine headaches. (Tr. 286.).

On April 9, 2003, Plaintiff saw Dr. Miles Belgrade a pain management specialist. (Tr. 296-304). Plaintiff rated her facial pain at a minimum of 6 on a 10-point scale, up to 10/10. (Tr. 296). She stated she had several episodes of pain each hour, 5-10 minutes apart, which got worse as the day progresses. (Id.). Dr. Belgrade noted that Plaintiff was alert, oriented, and cooperative during the interview and examination. (Tr. 298). She appeared to be at ease and comfortable and displayed no pain behaviors during the entire history and through most of the examination. (Id.). Dr. Belgrade

diagnosed Plaintiff with atypical facial pain syndrome stating that Plaintiff's condition goes beyond a simple diagnosis of trigeminal neuralgia due to multiple atypical features.  (Tr. 299).  He indicated that an anxiety disorder was an amplifying factor in her pain and if treated, could reduce the pain.  (Id.).  Dr. Belgrade recommended some additional antidepressants as well as a trial of acupuncture, relaxation training with a biofeedback therapist, and counseling of pain-related anxiety and stress management.  (Tr. 299-300).

Plaintiff also met with Psychologist Patrick Laughlin as part of the pain management consultation.  (Tr. 301-304).  Dr. Laughlin noted Plaintiff was responsive and cooperative with the interview and that she continues to have some symptoms of depression and daily anxiety attacks.  (Tr. 303).  He diagnosed her with a pain disorder with medical and emotional features, ongoing symptoms of depression, as well as panic disorder, some aspects of dependent personality, trigeminal nerve pain, along with other physical ailments.  (Id.).  He stated she would be a candidate for tension and pain management as well as biofeedback.  (Id.).

C.    **Plaintiff's Testimony**

At the July 31, 2003, administrative hearing, Ms. Redmann was represented by counsel and testified as to her impairments, conditions, and daily activities.  (Tr. 310-324).  Plaintiff testified that her last job had been at Walmart and the Robbinsdale Police Department where she was working a total of 40 to 60 hours a week.  (Tr. 313).  Plaintiff explained that she stopped working these jobs because of the onset of the extreme migraine which turned into the facial pain she had experienced over the last few years.  (Id.).  She testified that Walmart had denied her long-term disability benefits because they found that she should have been able to return to work for at least one day after her microvascular decompression surgery.  (Tr. 315).  Plaintiff also stated that Dr. Sethna believed she

might have muscular dystrophy rather than trigeminal neuralgia because of the returning pain, however, all the tests had been negative.  (Tr. 315-16).  She testified that there was nothing more medically that could be done, other than attending a pain management program.  (Tr. 317).

Plaintiff described her facial pain as electrical stabbing pain on both sides of her face from the forehead over the eyes, in her eyes, and into her jaw.  (Tr. 319).  She had up to 20 facial pain episodes a day and one episode could last up to 10 minutes.  (Id.).  When an episode occurs, Plaintiff has to stop what she is doing and lay down.  (Tr. 320).  She loses the ability to concentrate and the ability to speak.  (Id.)  Plaintiff testified that she usually has to lay down two to three times a day for about a half hour at a time.  (Id.).  On a bad day, which happens at least once a week, she has to stay in bed most of the day.  (Id.).

Plaintiff stated she still has anxiety attacks regularly from one to several times a day.  (Tr. 317).  During these attacks she suffers from rapid heartbeat, chest pain and nervousness and she has to immediately sit or lay down.  (Id.).  She also testified that she still suffers from dizziness, blurred vision and balance problems but they had subsided since she reduced her medications to only Neurontin for the pain.  (Tr. 317-18).  Ms. Redmann stated that she has learned to brace herself when she is standing to avoid falling but she still falls a couple of times a week.  (Tr. 318).  Plaintiff also stated that her asthma had increased over the last year along with the anxiety attacks.  (Tr. 319).

### D.    Vocational Expert's Testimony

Also at the July 31, 2003, hearing Julie Harren testified as a vocational expert ("VE") hired by the Social Security Administration.  (Tr. 324-331).  The ALJ posed a hypothetical question for Ms. Harren to consider an individual who is 38 years-old, has the educational background and work

11

history and experience of the Plaintiff, and fits the profile established by Dr. Gross of the Mayo

Clinic.  As such, this hypothetical individual should not be working in high stress areas, in

management, within a decision making process, changing environments of cold or warm, and purely

stationary positions.  This individual would need to stretch every 20 minutes of sedentary work and

take a break every couple of hours and avoid environments with dust, fumes, odors and gasses.

Ms. Harren opined that of her past work, Plaintiff would not be able to continue police work,

security dispatching, radio communications, and corrections officer because of the stress.  (Tr. 327).

She maintained that Plaintiff could still work as a service clerk, bank worker, and in bookkeeping

type jobs.  (Id.).  Ms. Harren also stated that Plaintiff could work as a receptionist, information clerk,

or appointment clerk of which there were 22,370 jobs in the state.  (Tr. 328).

The ALJ presented a second hypothetical based on Dr. Berliner's profile involving an

individual with the same age, educational background, and work history as the Plaintiff who's

symptoms were severe enough to interfere with her attention and concentration frequently.  (Tr.

328).  Up to 75 percent of the day symptoms will interfere to the extent that the patient is unable to

maintain persistence and pace.  This individual is not capable of functioning on a part time basis and

would miss four or more days per month.  This individual suffers from severe fatigue and would

need unscheduled rest periods, in addition to the standard two breaks and a lunch break.  They have

light weight lifting restrictions, can walk four city blocks without rest, and stand for 15 minutes at

a time.  This individual can sit about six hours of the day and stand and walk less than two.  (Tr.

329).  This individual has some limitations on twisting and could never bend, stoop or climb.  (Id.).

She could occasionally kneel and crouch, but never crawl, do overhead work, or rotate her neck.

(Id.).  The hypothetical individual could perform repetitive employment tasks involving his or her

arms and upper extremities and had good use of hands and fingers for bilateral manual dexterity and finger reactions.  (Id.).  Ms. Harren responded that such an individual would be precluded from all competitive employment and not able to keep up with competitive production standards.

The ALJ presented a third hypothetical which was seemingly based on Dr. Mark's and Dr. Paule's reports.  (Tr. 329).  This person had similar age, educational background and work history as Plaintiff.  (Id.).  They could lift 20 pounds occasionally and 10 pounds frequently, sit or stand about 6 hours in an 8 hour day, had unlimited pushing or pulling ability, and were to avoid moderate exposure to cold breeze and extreme cold.  (Id.).  No other limitations were assigned.  Ms. Harren opined that the individual could return to Plaintiff's job as a retail clerk, the security guard, the police clerk, the dispatcher, the radio communication operator, the bookkeeper, the pull tab seller, the bank worker, and the customer service clerk. (Tr. 329-330).

The ALJ finally asked whether an individual whose pain and symptoms were consistent with those the Plaintiff described during her hearing testimony, as well as in the forms she filed with the Social Security Administration, and this person was not able to work five days a week, eight hours a day, forty hours a week basis, if they would be able to do any of plaintiff's past work, or any other work in the regional or national economy.  Mr. Harren stated they would not.

### E.    The ALJ's Decision

On October 27, 2003, ALJ Quayle concluded that Ms. Redmann was not disabled within the meaning of the Social Security Act.  (Tr. 11-25).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

13

The Act further states that for an individual to be determined disabled, her physical or mental impairment(s) must be of such severity that she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which she lives, or whether a specific vacancy exists for her, or whether she would be hired if she applied for work.  Id. at § 423(d)(2)(A).

In determining whether or not Ms. Redmann was disabled, the ALJ followed the five-step sequential process outlined at 20 C.F.R. § 404.1520.  At the first step in the analysis, the ALJ determined that Ms. Redmann had not engaged in substantial gainful activity since the onset date of her disability.  (Tr. 15).  The second step in the sequential evaluation is to determine whether or not Ms. Redmann had a severe impairment, defined as a medically determinable impairment or combination of impairments that significantly limits the individual's physical or mental ability to do basic work activities.  Id. at § 404.1521.  The ALJ determined that Plaintiff's asthma and status post bilateral carpal tunnel release surgeries were impairments that do not significantly limit her physical or mental ability to meet the basic demands of work activity and were not considered severe impairments.  (Tr. 16).  However, the ALJ did find that the Plaintiff was severely impaired by trigeminal neuralgia; atypical face pain, post microvascular decompression surgery and post gamma knife radiation for trigeminal neuralgia; pain disorder; obesity; depression; and anxiety.  (Id.).

The ALJ followed the special procedure required by the regulations at 20 C.F.R. 416.920(a) to evaluate the severity of Plaintiff's  mental impairments.  (Tr. 16-18).  This procedure requires first, determinations of the existence of a medically determinable impairment, and second, the limitations resulting from any mental impairment as described in the Listing of Impairments in

Appendix 1, Subpart P, Regulations No. 4. The medically determinable existence of the mental impairment is assessed by evaluation of specific paragraph A criteria found at 20 C.F.R., Part 404, Subpart P, Appendix 1, § 12.00. If the A criteria are met, the limitations are determined via paragraph B by examining four areas of function which have been found to be relevant to the ability to work and correspond to the criteria of most of the mental disorders listed in Appendix 1: activities of daily living; social functioning; concentration, persistence and pace; and episodes of decompensation. The rating of each of these four areas is compared with the criteria set forth in the Regulations for determining the severity of a mental impairment. The ALJ found moderate restrictions in Plaintiff's activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentrations, persistence, or pace, and that there was no evidence of episodes of decompensation. (Tr. 17-18).

The third step requires a comparison of the claimant's severe impairments with the impairments listed in Appendix 1, Subpart P, Regulations No. 4, Listing of Impairments to determine if any of the claimant's severe impairments meets or equals a listed impairment. Appendix 1 contains a Listing of Impairments which identifies a number of different medical conditions and describes the required level of severity for each condition. Equivalence is to be determined "on medical evidence only," not an assessment of overall functional impairment, unless the specific finding or criterion of the particular listing requires a measurement in terms of functional limitation. 20 C.F.R. § 1520(c)(3) and 1526. The ALJ concluded that the claimant's physical and mental impairments considered individually or in combination, were severe, but did not meet or equal the severity required for any listed impairment. (Tr. 18).

The last two steps in the evaluation require the ALJ to determine whether the plaintiff has

the residual functional capacity (RFC), despite his impairments, to perform his past relevant work, or lastly, any other work existing in significant numbers in the national economy.  In determining Plaintiff's RFC, the ALJ evaluated the medical records, testimony, and assessments of Plaintiff's subjective complaints under Social Security Ruling 9607p, 20 C.F.R. §§ 416.929(c), and Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).  Under Polaski, because symptoms may cause greater impairment than can be shown by objective medical evidence alone, careful consideration must be given to any available information about the symptoms.  The credibility assessment under Polaski, requires that the relationship between the medically determinable impairments and the conclusions regarding functioning be described.  Subjective complaints may be discounted if there are significant inconsistencies in the record as a whole.  Polaski, 739 F.2d at 1331-22.  The ALJ found the Plaintiff's allegations regarding her limitations not totally credible.  (Tr. 24).  The ALJ acknowledged that Ms. Redmann had severe impairments that cause limitations of her ability to perform basic work activities, but to the extent that she alleges an inability to perform any significant work activities on a sustained basis, her allegations and subjective complaints were found to not be fully credible when considered in light of the evidence.  (Tr. 19).

The ALJ concluded that Ms. Redmann had a RFC for lifting and carrying ten pounds at a time, walking and standing two hours out of an eight-hour day, sitting six hours of an eight hour day with an option of breaking up her sedentary routine with a stretch protocol every twenty minutes and a regular break every couple of hours.  (Tr. 19).  She could not work in a weather changing environment (cold or warm), nor in an environment which may potentiate her triggers, such as being dusty or have varying odors.  (Id).  Plaintiff would have to avoid stationary positions including driving, in a semi-skilled job, with no work in high stress areas, roles in management, or the decision

16

making process. (Id.). In making this determination, the ALJ adopted the limitations consistent with those set forth by Dr. Gross after the January 15, 2003, examination. (Tr. 19, 289). The ALJ gave that portion of his opinion significant weight as it was consistent with the medical record. (Tr. 19). The ALJ did not, however, give significant weight to Dr. Gross' opinion that Plaintiff was totally disabled because it was based on Plaintiff's realistic vocational options such as location, factors the ALJ cannot take into account. (20 C.F.R. § 40415.66). The ALJ did not give Dr. Berliner's December 2002 opinion, that Plaintiff could not maintain persistence and pace to engage in competitive employment, significant weight as a treating physician because it conflicted with his April 2003 statement that she was doing fairly well and was stable. (Tr. 21, 281, 292).

Based on this RFC, the ALJ determined that Ms. Redmann was not able to perform her past relevant work because the demands of those jobs exceeded her remaining functional capacity. (Tr. 23). The ALJ noted that the VE had testified that based on the Plaintiff's age, education, relevant work history, and RFC, there were other jobs that existed in significant numbers in the national economy that the Plaintiff could perform. These jobs included receptionist, informational clerk, and appointment clerk, of which there were a total of 22,370 jobs. (Tr. 23). The ALJ found the testimony of the VE to be credible and persuasive and concluded that the Plaintiff was capable of making a successful adjustment to work that exists in significant number in the national economy. As such, the ALJ found Ms. Redmann to be not under a disability as defined in the Social Security Act, at any time throughout the date of this decision. (20 C.F.R. § 404.1520(f)).

### III. STANDARD OF REVIEW

Judicial review of the final decision of the Commissioner is restricted to a determination of whether the decision is supported by substantial evidence on the record as a whole. See 42 U.S.C.

§ 405(g); Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998); Gallus v. Callahan, 117 F.3d 1061, 1063 (8th Cir. 1997); Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989). Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Jackson v. Apfel, 162 F.3d 533, 536 (8th Cir. 1998); Black v. Apfel, 143 F.3d 383, 385 (8th Cir. 1998). In determining whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must evaluate all of the evidence in the record including searching for both substantial evidence supporting the Commissioner's findings and taking into account evidence that detracts from the decision. Brand v. Sec. of Dept. of Health, etc., 623 F.2d 523, 527 (8th Cir. 1980). In determining whether evidence is substantial, a court must also consider whatever is in the record that fairly detracts from its weight. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989) (citing Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951)).

A court, however, may not reverse merely because substantial evidence would have supported an opposite decision. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000) (internal citations omitted); see also Gaddis v. Chater, 76 F.3d 893, 895 (8th Cir. 1996). The Court may reverse the Commissioner's decision if the evidence compels reversal, not merely because the evidence supports a contrary decision. Williams v. Sullivan, 960 F.2d 86, 89 (8th Cir. 1992).

In social security cases, the reviewing courts are generally guided by the following factors:

1)      Findings of credibility made by the ALJ;
2)      Education, work history and age of the claimant;
3)      Medical evidence given by the claimant's treating physicians;
4)      Subjective complaints of pain and description of claimant's physical activity and impairments;
5)      Corroboration by third parties of claimant's impairments;
6)      Vocational testimony based on proper hypothetical questions fairly setting forth the impairments; and

7)    Testimony of consulting physicians.

Brand, at 527.

### IV.  CONCLUSIONS OF LAW

Ms. Redmann does not dispute the ALJ's findings as to steps one through four of the five

step analysis for determining whether a plaintiff is disabled.  Rather, Plaintiff disputes the issues

which fall within step five: Whether the Plaintiff has the RFC to perform substantial gainful

employment which exists in significant numbers in the national economy.  (20 C.F.R. § 404.1520).

Plaintiff argues that the ALJ's findings regarding the Plaintiff's RFC are not supported by

substantial evidence, that the ALJ erred in improperly discounting the expert opinions of the

Plaintiff's treating source, Dr. Anthony Berliner, and that the ALJ also erred in rejecting the medical

opinions of the Plaintiff's treating neurologist, Dr. Michael Sethna.  This Court finds that the ALJ's

decision failed to properly weigh and analyze Dr. Berliner's opinion as a treating physician, but did

not err with respect to his evaluation of Dr. Sethna's opinion.  Having rejected the opinions of both

Dr. Berliner and Dr. Sethna, the ALJ based his decision regarding RFC on the report of Dr. Gross.

Without the proper analysis supporting the rejection of Dr. Berliner's opinions, this Court is unable

to determine if the ALJ's decision regarding Plaintiff's RFC is supported by substantial evidence

on the record as a whole.  This is especially true because the ALJ also properly rejected Dr. Gross'

opinion that Plaintiff was totally disabled, because it was based in part upon factors the ALJ could

not consider.  The case must, therefore, be remanded to the ALJ to more fully analyze his rejection

of Dr. Berliner's opinion, and to again evaluate, in light of that analysis, the Plaintiff's RFC.

**A.     The ALJ Failed To Properly Evaluate Dr. Berliner's Opinions As The Treating Physician.**

The ALJ discounted Dr. Berliner's opinions because they were inconsistent with a statement

he made in April 2003.  This Court finds that the ALJ failed to properly evaluate the weight of the treating physician's opinion, and Dr. Berliner's April 2003 statement has been misconstrued and is not inconsistent with his December 2002 opinion.

The RFC is what a claimant can do despite their limitations, and it must be determined on the basis of all relevant evidence, including medical records, physicians' opinions, and the claimant's descriptions of his or her limitations.  See 20 C.F.R. § 404.1545(a); 20 C.F.R. § 416.9445(a); Anderson v. Shalala, 51 F.3d 777,779 (8th Cir. 1995).  Generally, a treating physician's opinion is entitled to substantial weight and ordinarily should not be disregarded.  See 20 C.F.R. § 404.1527(d)(2); Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).  The opinions of treating physicians are only given controlling weight if they are well supported by medically acceptable clinical and laboratory diagnostic techniques and are consistent with other substantial evidence in the record as a whole.  See 20 C.F.R.§ 404.1527(d)(2); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998).  Such opinions of treating physicians do not automatically control in deciding a social security disability claim since the record must be evaluated as a whole.  See Cruze v. Chater, 85 F.3d 1320, 1324-25 (8th Cir. 1996).  However, the opinions of consulting physicians who examine a claimant once or not at all generally do not constitute substantial evidence.  See Kelly, 133 F.3d at 589.  The ALJ is not bound by the treating physician's opinion where the ALJ has identified an adequate reason for not accepting the treating physician's opinion. See Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993); See also Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). If the ALJ gives limited or non-controlling weight to a treating physician's opinion, the ALJ, "must always give good reasons for the particular weight given to a treating physician's evaluation." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000); See also Homstrom v. Massanri, 270 F.3d

20

715, 720 (8th Cir. 2001); 20 C.F.R. § 404.1527; SSR 96-2p.  The failure to discuss or consider a

treating physician's opinion constitutes error.  See Prince v. Bowen, 894 F.2d 283, 285-86 (8th Cir.

1990).  Failing to give an explanation for the rejection of a treating physician's opinion is grounds

for remanding for further proceedings.  See Lanning v. Heckler, 777 F.2d 1316, 1317-18 (8th Cir.

1985).  If the ALJ determines the opinion of the treating physician is not to be controlling, the ALJ

looks at the following factors to determine what weight to give the opinion:  (1) the length of the

treatment relationship; (2) the nature and extent of the treatment relationship; (3) the quantity of

evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; and

(5) whether the physician is also a specialist; and (6) and other factors brought to the ALJ's

attention.  See 20 C.F.R. § 404.1527(d).

In this case, the ALJ erred because he did not articulate sufficient analysis of the factors

under 20 C.F.R. § 404.1527, and he failed to set forth adequate reasons for not giving Dr. Berliner's

opinion controlling weight.  While the ALJ stated he was not giving the opinion of Dr. Berliner

significant weight, he never actually states what level of weight he was giving it.  The ALJ's

analysis rejecting Dr. Berliner's opinion is inadequate.  The regulations require the ALJ to consider

a list of factors under 20 C.F.R. § 404.1527 when rejecting the treating physician's opinion.  The

ALJ granted only a few sentences of his decision to addressing Dr. Berliner's opinion:

> "The undersigned considered the opinions of the various medical sources consistent
> with Regulation 20 C.F.R. 404.1527 and 20 C.F.R. 416.927.  The undersigned
> considered the opinion Dr. Berliner as set forth in [his RFC].  He opined in
> December 2002 that the claimant could work about six hours and that her symptoms
> would interfere to the extent that she would be unable to maintain persistence and
> pace to engage in competitive employment.  However, the undersigned does not give
> the opinion of Dr. Berliner significant weight as it conflicts with his opinion of April
> 2003 that she was doing fairly well and was stable." (Tr. 21).

The ALJ did not acknowledge the long-term treating physician relationship between Dr. Berliner

and Ms. Redmann.  Nor did the ALJ discuss the extent of the treating relationship.  Dr. Berliner had

seen Ms. Redmann on numerous occasions from the onset of her symptoms in October 2001, until

at least April 30, 2003.  (See Tr. 182-187; 280-285; 292-295).  He was also included, as the primary

care physician, in the correspondence among other doctors that treated Ms. Redmann.  (See Tr. 212;

230-231; 236-255; 264).  There was no discussion of the evidence supporting the opinion of Dr.

Berliner.  In fact, the only factor the ALJ addressed as a grounds for discounting Dr. Berliner's

opinion was that it was inconsistent with a later statement made by Dr. Berliner.  The regulations

direct the ALJ to consider whether the treating physician's opinion is internally inconsistent or

otherwise inconsistent with the other evidence on the record.  See 20 C.F.R. § 404.1527(d)(3)-(4).

In this case, the ALJ discounted Dr. Berliner's opinion because it was internally inconsistent.  The

ALJ did not discuss the consistency of Dr. Berliner's opinion with the record as a whole.  As such,

the ALJ only partly considered one of the six factors listed in 20 C.F.R. § 404.1527.

In addition to not fully analyzing Dr. Berliner's opinion, the ALJ's proffered reason for

rejecting the opinion is insufficient.  The ALJ discounted Dr. Berliner's opinion because it "conflicts

with his opinion of April 2003 that [Ms. Redmann] was doing fairly well and was stable."  Dr.

Berliner's statements from the April 30, 2003, appointment are taken out of context.  In the report,

Dr. Berliner lists Ms. Redmann's multiple health problems including her facial pain, asthma, and

bowel and bladder status.  Dr. Berliner then states "Otherwise [Plaintiff] has been doing fairly well.

The breathing has been stable.  No chest pains. Bowel and bladder stable."  As a whole, Dr.

Berliner's statements are not in conflict with his prior opinion.  He acknowledges that Plaintiff has

ongoing multiple health problems including her facial pain and merely states that other than those

problems, she is doing fairly well.  His statements regarding her being stable were in reference to

the status of her breathing, bowel and bladder.  Even interpreting the report as a broader statement

that despite these problems Plaintiff is doing well and stable, does not mean that her situation has

improved, only that it has not gotten worse than what his prior opinion set forth.  Such a statement

is not in conflict with his prior opinion.  Without analysis of any of the other factors, the out of

context statements made on April 30, 2003, are not an adequate reason for rejecting the opinion of

a treating physician.  We are unable to conclude that substantial evidence supports the ALJ's

decision to give little weight to Dr. Berliner's opinions because the only reason given is inadequate

and the record of the ALJ's analysis for any other reasons is incomplete.

**B.     The ALJ Properly Evaluated The Plaintiff's Credibility Before Rejecting Dr. Sethna's opinion.**

Plaintiff argues that the ALJ erred in rejecting Dr. Sethna's opinion as a treating neurologist

pointing to pieces of evidence in support of his opinion.  Dr. Sethna's October 18, 2002, letter

opining that Plaintiff cannot work, specifically states that such an opinion is based on Plaintiff's

description of her pain.  (Tr. 229).  The ALJ rejected Dr. Sethna's opinions because they placed too

much emphasis on the claimant's subjective allegations, which the ALJ determined were not entirely

credible.  (Tr. 21, 229-231).  The ALJ considered Plaintiff's subjective allegations under Polaski v.

Heckler, 739 F.2d 1320 (8th Cir. 1984), but determined that "to the extent that the claimant alleges

an inability to perform any significant work activities on a sustained basis, her allegations and

subjective complaints are found not to be fully credible when considered in light of the evidence."

(Tr. 19).  This Court finds that while there may be some evidence that supports Dr. Sethna's opinion,

the ALJ's finding that the Plaintiff was not wholly credible was supported by substantial evidence

and an opinion based on those subjective complaints could be legitimately rejected.

In Polaski, the Eighth Circuit demanded that: [the ALJ] give full consideration to all

evidence relating to a plaintiff's subjective complaints, including the claimant's prior work record,

and the observations by treating physicians and third parties relating to such matters as:

1.    the claimant's daily activities;
2.    the duration, frequency and intensity of pain;
3.    precipitating and aggravating factors;
4.    dosage, effectiveness and side effects of medication;
5.    functional restrictions.

Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

Credibility findings lie within the purview of the ALJ but such findings must be supported

by substantial evidence. See Hardin v. Heckler, 795 F.2d 674, 676 (8th Cir. 1986); Johnson v.

Heckler, 744 F.2d 1333, 1338 (8th Cir. 1984).   The ALJ's credibility finding is entitled to

considerable deference. See, e.g., Johnson v. Chater, 87 F.3d 1015, 1018 (8th Cir. 1996)(court does

not substitute its opinion of the plaintiff's credibility for that of the ALJ).   If subjective testimony

of symptoms is inconsistent with the record as a whole, the ALJ may disbelieve and discount it.

Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990); Polaski, 739 F.2d at 1322; Gray v. Apfel, 192

F.3d 799, 803 (8th Cir. 1999); Isom v. Schweiker, 711 F.2d 88, 90 (8th Cir. 1983) (ALJ may

consider inconsistent statements in assessing claimants' credibility).   Furthermore, it is not necessary

for the ALJ to explicitly discuss each Polaski factor.   Strongson v. Barnhart, 361 F.3d 1066, 1072

(8th Cir. 2004), citing Brown v. Chater, 87 V.3d 963, 965 (8th Cir. 1996).   However, if an ALJ

rejects a claimant's testimony, he must make an express credibility determination explaining the

reasons for not believing the testimony. Singh v. Apfel, 222 F.3d 448, 452 (8th. Cir. 2000);

Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992) (ALJ must make express credibility

determinations and set forth on the record inconsistencies that lead to this conclusion); Rickets v.

Secretary of Health and Human Services, 902 F.2d 661, 664 (8th Cir. 1990).   If an ALJ discredits

testimony and explicitly gives good reasons for so doing, this Court is bound by that judgment unless it is not supported by substantial evidence on the record as a whole. Robinson, 956 F.2d at 841.

In this case, the ALJ properly evaluated Ms. Redmann's subjective allegations under the factors set forth in Polaski, and found that they were not credible to the extent that they alleged an inability to participate in any work-related functions. (Tr. 18-19). The ALJ noted that despite her alleged facial pain, pain disorder, obesity, and mental illness, Plaintiff was still able to perform a variety of daily living activities. (Tr. 21). Plaintiff was able to take care of her personal needs, perform light household chores, garden, shop, play games, use the Internet, all of which appeared inconsistent with a finding of disability. (Tr. 21). The ALJ also noted that Ms. Redmann got along well with her family, visits friends, and is able to concentrate on crocheting, paying her bills, and handling her finances. (Tr. 21-22). In regards to the duration, the frequency, and intensity of pain alleged by Plaintiff, the ALJ noted that several doctors, despite multiple visits and Plaintiff's allegation that her pain was constant, averaging about nine on a ten-pint scale, did not observe any manifestation of visible pain behavior, and that she looked more composed than other patients they had seen with an attack of trigeminal neuralgia. (Tr. 21, 231, 301). Although, Plaintiff alleged that cold could be a precipitating factor for her facial pain, Dr. Sethna noted that when he placed a cold tuning fork on her face she reported pain but did not display the typical pain behavior associated with an attack of trigeminal neuralgia. (Tr. 231). In addition, the record notes that Plaintiff was able to sleep through the night a fact not often found in patients with trigeminal neuralgia. The ALJ did acknowledge the evidence in the records that Plaintiff had been on multiple medications experiencing some side effects and mixed effectiveness. (See Tr. 20). The ALJ further noted that

on examination Plaintiff showed a normal gait, no nerve impingement on range of motions, and no mechanical dysfunction. (Tr. 22). Plaintiff revealed good reflexes and strength in her arms and legs. (Id.). Furthermore, the ALJ noted that Ms. Redmann did not allege any mental impairment on her disability report, which is inconsistent with a finding that such an impairment is disabling. See Sullins v. Shalala, 25 F.3d 601, 604 (8th Cir. 1994). In addition, the ALJ points to the record which indicates that some of the mental health medication was helping Plaintiff's symptoms. (Tr. 22).

In this case, the ALJ complied with the requirements in Polaski for assessing Plaintiff's subjective complaints by making express credibility determinations and pointing out inconsistencies in the record. The ALJ properly rejected Plaintiff's subjective complaints of pain. As such, we find substantial evidence supports the ALJ's decision to reject Dr. Sethna's opinion which was mostly based on the Plaintiff's subjective complaints. Although the Plaintiff has pointed to evidence that may support Dr. Sethna's opinion other than Plaintiff's complaints, this Court cannot reverse a finding only because substantial evidence would have supported an opposite decision. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000) (internal citations omitted); see also Gaddis v. Chater, 76 F.3d 893, 895 (8th Cir. 1996).

After discounting the opinions of the treating physician Dr. Berliner and neurologist Dr. Sethna, the ALJ based his RFC on the opinion of Dr. Gross, whom himself had concluded Plaintiff was totally disabled, based in part upon factors, the law precludes the ALJ to consider. The ALJ did not err in rejecting Dr. Sethna's opinion as it was based on the Plaintiff's subjective complaints which the ALJ properly analyzed as not totally credible. Without adequate reasons for rejecting Dr. Berliner's opinion and without the proper analysis as to what weight should have been given to his opinion in determining the Plaintiff's RFC, this Court cannot decide whether the ALJ's findings

26

regarding Plaintiff's RFC is supported by substantial evidence.  The Court is compelled to reverse the Commissioner's decision and direct that the case be remanded for further administrative proceedings to fully analyze the factors leading to the rejection of Dr. Berliner's opinion, and, in light of that analysis, to again evaluate Plaintiff's RFC.  It may well be that Plaintiff has the RFC to perform jobs in the national economy, and is not disabled.  For the reason set forth above, however, the Court is unable to conclude that the ALJ's decision in this regard was supported by substantial evidence on the record as a whole.

## V.  RECOMMENDATION

Based on the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Plaintiff's Motion for Summary Judgment [# 8] be **DENIED**;

2.    Defendant's Motion for Summary Judgment [# 10] be **DENIED**; and

3.    The Commissioner's decision should be **REVERSED** and the case **REMANDED** for further administrative proceedings consistent with this Report and Recommendation.


DATED: May 9, 2005                     s/ *Franklin L. Noel*_____
                                       FRANKLIN L. NOEL
                                       United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **May 26, 2005**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under the rules shall be limited to ten pages. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.